CARPENTER, adm'r, &c. *vs.* DANFORTH and another.

Although there is a certain trust relation between the shareholders and the directors of a corporation, yet the trust put in the directors usually extends, and in any particular case will be assumed to have extended, only to the management of the general affairs of the corporation, with a view to dividends of profits, and therefore that the trust relation between the stockholder and director extended no farther.

Hence a sale of stock, by a stockholder to a director, or the stock itself, is not so far connected with, or the subject of the trust or trust relation, which is admitted to exist, as to subject the director to, or give the seller the benefit of the principle of equity applicable to the dealings and contracts of parties between whom there is a trust. or confidential relation, and to require the purchaser to prove not only that he paid a full and fair price for the stock, but also that he disclosed to the seller every fact' or circumstance known to him, and not known to the seller, material on the question of the value of the stock.

Such a case is not a case of constructive fraud; and there is no such trust or confidential relation between the stockholder and director as to make the above principle of equity applicable; and the sale, if set aside, must be set aside on the ground of actual positive fraud.

As between buyer and seller, fraud may be perpetrated by a false and fraudulent representation of a material fact, or by a *fraudulent* concealment of a material fact.

Where there was no evidence to show that on a sale of stock by a stockholder to a director of the corporation the purchaser made any material representation as to the affairs or condition of the company, or of any fact material to the question of the value of the stock, or any false representation of a material fact, that induced the sale; or that he either *did* or *said* any thing to mislead the seller, or to divert or prevent him from ascertaining all that could then be known of the affairs, condition and prospects of the company;

Carpenter *v.* Danforth.

or from making any inquiry as to any fact material on the question of the value of the stock; or that the purchaser *did* any thing which misled or deceived the plaintiff, or was likely to mislead or deceive him; or which diverted or was likely to divert or prevent him from learning all that he, the purchaser, knew about the value of the stock, or any fact material to the question of value; *Held* that under these circumstances the sale could not be declared void, on the ground of fraudulent representations of material facts or fraudulent concealment of material facts, by the purchaser.

ACTION to have a sale of stock set aside, on the ground of fraud and undue influence.

*L. B. Woodruff* and *Mr. Taft,* for the plaintiff.

*Wm. M. Evarts,* for the defendants.

SUTHERLAND, J. The defendant Danforth bought of the plaintiff, as administrator, in December, 1862, one hundred and thirty-six shares of the stock of " The National Bank Note Company," a New York corporation, for $60 a share, the par value being $50 a share. When Danforth bought the stock he was one of the trustees or directors of the corporation, and had been from its organization in 1859.

The purpose of this action is, to have the sale of the stock declared void, and the plaintiff restored to the rights and interests which he would have had, had the sale not been made, upon the ground of fraud and undue influence.

There is a preliminary question of law, of great, perhaps I should say, of controlling importance. The counsel for the plaintiff insists, and has submitted an elaborate and very able brief to show, that from the relation between Danforth as a trustee, or director, and the plaintiff as a share or stockholder, undue influence on the one side, and a corresponding trust and confidence on the other side, is to be presumed; so that, applying to this case a well known principle of equity applicable to dealings and contracts of parties, between whom there was a trust or

Carpenter *v.* Danforth.

confidential relation, the result would be that the sale or transaction must be declared void, unless the proofs show, independent of the question of actual or positive fraud, not only that Danforth paid a full and fair price for the stock, but also that he disclosed to the plaintiff every fact or circumstance known to him, Danforth, and not known to the plaintiff, material on the question of the value of the stock. Indeed, some of the authorities referred to by the counsel, state the duty of disclosure arising from the trust or confidential relation so broadly that, holding the principle in equity applicable to this case, and following these authorities, the sale in question would have to be declared void, irrespective of any question of fraud in fact, or of fraudulent intent, and irrespective of any question as to the fairness or fullness of the price paid; unless the proofs show that Danforth disclosed to the plaintiff, not only all the facts known to him, Danforth, but all *that he might with reasonable diligence have known,* which were material on the question of the value of the stock. (*See Howell* v. *Ramson,* 11 *Paige,* 541, *and the case in* 6 *Vesey, there referred to.*)

There is, certainly, no doubt, if the principle of equity referred to is applicable to this case, that the plaintiff started in it, with the presumption in his favor, that the sale was fraudulent and void, and that the *onus* was on the defendant Danforth, to show that he took no advantage of the confidential relation, or of knowledge acquired thereby; that the sale or transaction was fair in all respects; that he paid a fair and adequate price for the stock; and that he disclosed to the plaintiff all the material facts within his, Danforth's, knowledge, not known to the plaintiff, bearing on the question of the value of the stock. (*See* 1 *White and Tudor's Lead. Cas. in Eq.* 3d *Am. ed.* 229; *American Note,* 1 *Story's Eq.* §§ 307–324.)

The question is, does the principle of equity referred to, apply to this case?

There was certainly a trust relation between the plaintiff as the holder of, or as the person having the legal title to, the shares of stock, and the defendant Danforth, as a trustee or director. A corporation aggregate can only act by agents. Its trustees or directors are its agents for managing its affairs. They are such agents, viewing the corporation either in the abstract, as an immaterial thing, of legislative creation, with a name and certain powers and rights given by law, or as composed of its corporators, or shareholders, having the right to share *pro rata* in its dividends. There is, therefore, a certain trust relation between the shareholders and the directors of a corportion ; but the trust put in the directors usually extends, and I must assume that in this case it extended only to the management of the general affairs of the corporation, with a view to dividends of profits; and, therefore, that the trust relation between the plaintiff and the defendant Danforth, extended no farther. The title to the property of a corporation is in neither the directors nor shareholders. It is in the corporation as an abstract, immaterial thing of legal creation. The directors are not trustees for the sale of the stock of the corporation. They have no power, *as directors*, to sell stock; they have no power to sell any stock but their own. The defendant Danforth, was not a trustee for the sale of the plaintiff's stock. The plaintiff's *stock* was not the subject of trust between them, nor had the trust relation between them any connection with the plaintiff's stock, except so far as the good or bad management of the general affairs of a corporation by its directors, indirectly affects the value of its stock.

In *Knight* v. *Majoribanks*, (2 *Mac. & G.* 10,) it was held, " that the circumstance, that two parties stand towards each other in the relation of trustee and *cestui que trust*, does not affect any dealings between them, unconnected with the subject of the trust." I think it will be found, in most of the cases referred to by the counsel, that it

appeared, or that it was assumed, that the trust, or trust relation, extended to the subject of the dealing, or contract in question. (Attorneys and solicitors are officers of the courts, and perhaps for this reason, courts of equity have scrutinized most closely the dealings between attorney and client, but my examination of the cases does not enable me to say, that it has ever been held that an attorney, whose business relations with his client are and have been limited to the collection of a single note, cannot buy a horse of his client, without subjecting the transaction and himself to the rule or principle of equity referred to.) In *Aberdeen Railway Co.* v. *Blakie*, (1 McQueen's *House of Lords Cases*, 461, 471,) it was merely held that a director of the company could not buy certain articles, (iron chairs for the cars,) of himself, or of a firm of which he was a member, for the company. The cases 1 *Edward's Ch.* and in 3 and 5 *Paige*, referred to by the counsel, so far as they have any bearing on the question we are considering, merely show that the directors of a corporation are liable to the stockholders for misconduct, or gross or fraudulent mismanagement of its affairs, or for a fraudulent breach of trust.

The counsel does not say, and he could not say, that the strict or technical relation of trustee and *cestui que trust* exists between the director and shareholder, for the legal title to the corporate property is not in the directors; but he insists, that the trust relation which does exist between them, as to the management of the affairs of the corporation, compels the director, on a purchase of stock, to disclose all the facts within his knowledge, material on the question of value, not known to the seller—that this disclosure is a duty *arising from the trust relation*, independent of the question of positive or actual fraud; in other words, that the trust or trust relation, *for or as to the management*, subjects the director to the rule or principle of equity which has been so often referred to.

Carpenter *v.* Danforth.

I think that the sale or transaction, or its subject, is not so far connected with, or the subject of the trust, or trust relation which is admitted to exist, as to subject the director to, or give the seller the benefit of, the principle of equity, or to make the principle reasonably applicable to the transaction.

It will not do to make the principle generally applicable to purchases by directors of the stock of their corporations.

As to stocks which have a regularly quoted price or market value, parties generally sell and buy them, with reference to *this* price or value, rather than with reference to their real value, or any opinion of their real value, founded on a knowledge, or supposed knowledge of the condition of the corporations or of their affairs.

As to such stock, would it do to make the purchase of it by a director, though it happened to be the stock of his own corporation, an exception, and to say, that the parties dealt with reference to the real condition of the corporation and the supposed real value of the stock, founded on a knowledge, or supposed knowledge of its affairs? Plainly it would not; and plainly in such case, the application of the principle of equity would be unreasonable.

But the duty arising from the *mere trust relation* must be the same, in all cases where the same trust relation exists; for courts of equity though they deal with special cases, apply general principles. My conclusion is then, that this case is not a case of constructive fraud—that there was not any such trust or confidential relation between the plaintiff and Danforth, as to make the principle of equity, which has been referred to, reasonably applicable to the case.

In view of the pleadings and of the conceded facts of the case, I think it follows that the sale in question, if set aside, must be set aside on the ground of actual, positive fraud.

Carpenter *v.* Danforth.

As between buyer and seller, fraud may be perpetrated, by a false and fraudulent representation of a material fact, or by a *fraudulent* concealment of a material fact. Taking the plaintiff's own account of the transaction, either on the stand as a witness, or in his letter of the 22d of May, 1863, and it can hardly be said that the plaintiff pretends, or that it can be pretended, that Danforth made any material representation, as to the affairs or condition of the company, or any representation of a fact material to the question of the value of the stock.

Certainly there is no evidence to show that Danforth made any false representation of a material fact, that induced the sale. Danforth said he would do better for Glover's children, or for his estate, than the company would do—that is, that he would give more for the stock, than the plaintiff had been offered by the company, or by an officer of the company. If this can be said to have been the representation of a fact, it was not a false representation. Danforth was willing to give, and did give more for the stock, than the plaintiff had been offered by the company, or for the company. Danforth substantially told the plaintiff that he was induced to make the offer, and to buy the stock, for the purpose of voting on it, and thus changing, or getting control of, the direction and management of the affairs of the company. However important this statement may be on the question of fraudulent concealment, it cannot be said to have been the representation of a fact material or relating to the question of the value of the stock. Danforth referred generally to the work the company was doing for the government of the United States, and to the report of the secretary of the treasury, as bearing on the question of the continuance of the work. If what Danforth said, as to these matters, can be said to have amounted to the representation of a fact, what he said was true, and known to the plaintiff.

The plaintiff had read the report of the secretary of the treasury, and was informed generally as to the work and business of the company. He knew that the principal business of the company was engraving and printing for government.

[ It is plain that the sale cannot, under the pleadings and proofs, be rescinded, on the ground of fraudulent repre- sentations. Can it be rescinded on the ground of fraudu- lent concealment? ]

This question is not a question of the bare suppression or concealment of a material fact, but a question of the intentional and fraudulent suppression or concealment of a material fact, which Danforth was under a *legal* obliga- tion to disclose.]

Notwithstanding the conceded relation between the parties, and the conceded circumstances under which the negotiations for the sale, and the sale itself, took place, and the closeness, if I may use the expression, of the cor- poration, its affairs and condition,[ it cannot be said, I think, that Danforth was under a *legal* obligation to say any thing about the affairs or condition of the corporation, or to disclose any fact or circumstance, material on the question of value. ](*See* 1 *Story's Equity*, §§ 147, 148, 149, 207; *Laidlaw* v. *Organ*, 2 *Wheat.* 195; *Fox* v. *Mackreth*, 2 *Brown's Ch.* 420; *Turner* v. *Harvey*, Jacobs, 178; *Livingston* v. *Peru Iron Co*,. 2 *Paige*, 390.)

The evidence shows that the extraordinary profits which enabled the company to declare the extraordinary divi- dends in the year 1863, after the sale in question, came from the extraordinary amount of work done for the government on the postage currency, and the extraor- dinary price or rate charged the government for the work, and, in the end, actually allowed and paid by the govern- ment for the work; but I think the evidence also shows that in December, 1862, when the sale in question took place, all the managers and officers of the company

thought that the continuance of the work for the government, especially on the postage currency, was precarious, and might be terminated at any moment; and 1 think the evidence also shows that no bill was made out and rendered to the government for work on the postage currency, until after the sale in question, and at the end of May, 1863, and that, until that bill was allowed and paid, February 2, 1863, there was no reasonable certainty as to the price or rate the company would be paid for the work; and that, up to that time, the officers and managers of the company considered it doubtful, or, at all events, by no means certain, at what price or rate the company would be allowed and paid for the work.

Now, in view of what has just been said, and of other conceded facts and circumstances, I think the question of fraudulent concealment in this case is this: Did Danforth intentionally and fraudulently do or say any thing, to divert or prevent, and which did divert or prevent, the plaintiff from looking into, or making inquiry, or further inquiries, as to the affairs or condition of the company and its prospects for dividends, especially as to the work and the amount of the work for the government on the postage currency, and the anticipated or hoped for compensation therefor?

It was the plaintiff's right to judge for himself as to the value of the stock, and to enable him to do so, it was his right, and perhaps his duty, to inform himself as to facts material on the question of value, and Danforth had no right to do or to say any thing, with a view of diverting or preventing the plaintiff from getting such information. Therefore, I think, the sale should be set aside, if the pleadings and proofs in the case authorize me to answer the question of fraudulent concealment, *as I have stated it*, in the affirmative, irrespective of the consideration of the question whether the plaintiff would or would not probably have sold the stock for the price he did, had he made

further inquiries or examination, and informed himself of all the facts and circumstances then capable of being ascertained, material on the question of the value of the stock.

It is apparent, that nearly all of the evidence taken in this case was admissible, with a view to the question of fraudulent concealment as I have stated, and it is plain, that in considering the question and the evidence, the situation of the parties at the time of the transaction, the relation between them, the circumstance that the plaintiff was an administrator representing infants, and is not to be presumed to have been informed as to the affairs and condition of the company, and the circumstance that the defendant Danforth was a director of the company and had been since its organization, and is to be presumed to have been well informed as to the affairs and condition of company, and the circumstances that the company may be said to have been a close corporation; that it had never declared a dividend, and that its stock had no quotable market value, and may be said not to have had any public market value, are all to be taken into consideration and have due weight given to them.

The defendant Danforth, in his answer, and on the stand, as a witness, most unequivocally and fully denies any fraud or fraudulent concealment, artifice, device, management, improper influence, or intentional suppression of any fact.

I cannot say that there is any evidence that Danforth *did* any thing to mislead or deceive the plaintiff, or to divert or prevent him from ascertaining all that could then be known of the affairs, condition and prospects of the company, or from making any inquiry as to any fact material on the question of the value of the stock, or that Danforth *did* any thing which *did* mislead or deceive the plaintiff, or which *did*, or was likely to mislead or deceive him, or which did or was likely to divert or prevent him from

learning all that Danforth knew about the value of the stock, or any fact material to the question of value.

Did Danforth, intentionally and fraudulently, *say* any thing to divert or prevent, or which did divert or prevent the plaintiff from further inquires as to the value of the stock, or from ascertaining any fact material to enable the plaintiff to form his own opinion as to the value of the stock? I do not think the evidence shows that he did. The remark, that he would do better for the children or for Glover's estate than the company, considering the inquiries the plaintiff did make as to the affairs of the company and the value of its stock, of other persons most likely to be informed, and to give him information, and considering the answers he received, could not have misled the plaintiff or prevented further inquiry. There is no evidence of any preconcert or collusion between Danforth and the parties of whom these inquiries were made. Nor would it be a fair or reasonable conclusion from the evidence and the circumstances under which the remark was made, that it was intended to mislead the plaintiff and divert him from further inquiry.

Nor do I see how the remark of Danforth, as to his wanting the stock to use at the next election of directors, could have misled the plaintiff and prevented further inquiry. After the extraordinary dividends, or some of them, were declared, the plaintiff was told that this remark was "subterfuge;" but I cannot say that the evidence shows that it was a subterfuge, or that it was made with any fraudulent intent, or that it was not true. The transfer of the stock to the defendant Williamson, the purchases of other stock from other parties, and the subsequent effort of adverse parties to prevent the stock from being voted on, are quite as consistent, to say the least, with the theory that the remark was honest and true, as with a contrary theory.

Considering that the extraordinary dividends would

naturally attract attention and excite suspicion, and considering other undisputed circumstances, I cannot say that Danforth's suggestions that the plaintiff should write the letters of the 22d and 24th of May, are not as consistent with innocence as guilt. It is not pretended that Danforth suggested the terms or details of the letter of the 22d of May. The plaintiff swears that that letter contained a true account of the transaction.

Upon the whole, without undertaking to refer to the immense mass of evidence in this case, at all in detail, I am of the opinion that the pleadings and proofs would not justify me in answering the question of fraudulent concealment in the affirmative; and therefore I think there must be judgment for the defendants dismissing the complaint, but under the circumstances without costs to either of the defendants, as against the plaintiff.

[New York Special Term, April 6, 1868. *Sutherland,* Justice.]