SAMUEL McINTYRE, Respondent, v. THE AJAX MINING COMPANY, a Corporation, Appellant.

No. 1564.    (77 Pac. 613.)

1.  Contracts: Provision as to Payment: Construction.
    A contract providing that two sums advanced in the formation of a mining company shall be repaid pro rata out of the proceeds of "ore sales, compromises or otherwise," and that no other money shall be paid out, except for necessary operations, till after the payment of such sums, is to be construed as meaning that, if the net proceeds of ore sales and compromises does not, within a reasonable time, amount to enough to liquidate such claims, the obligation to pay them shall become absolute, and not dependent on the proceeds of ore sales or compromises.[1]

---

[1] McIntyre v. Mining Co., 20 Utah 323; Johnston v. Schenck, 15 Utah 490; Busby v. Century G. Min. Co., 27 Utah 231.

2. **Same: Claim against Corporation: Purchase by Director.**
One may rightfully purchase a bona fide existing claim against
a corporation of which he is a director, if the rights of
other creditors are not involved, and he is under no present
duty to act in the transaction for the corporation.

(Decided July 15, 1904.)

Appeal from the Third District Court, Salt Lake
County.—*Hon. C. W. Morse,* Judge.

Action to recover a certain sum of money claimed
to be due from the defendant to the plaintiff. From a
judgment in favor of the plaintiff, the defendant ap-
pealed.

Affirmed.

*Messrs. King, Burton & King* for appellant.

*Messrs. Sutherland, Van Cott & Allison* and *An-
drew Howat, Esq.,* for respondent.

STATEMENT OF FACTS.

While there is some apparent conflict in the testi-
mony on some of the material issues, the following facts
are supported by clear preponderance of the evidence:
In 1894 Peter C. Burke and Frank Salisbury were the
owners of nineteen twenty-fourths of the Champlain No.
2 mining claim, and all of the Fraction mining claim,
situate in Tintic mining district, Utah. Burke and Sal-
isbury conveyed their title to the foregoing mining
property to John T. Sullivan, who held the same in
trust for them. Certain parties, namely, Henry M.
Ryan, W. I. Snyder, and Henry Shields, desired to form
a corporation, and purchase the property and take the
title thereto to the corporation, and in pursuance of this
plan negotiated with Burke and Salisbury for the pur-
chase of their interest in these mining claims. An agree-

ment in writing was accordingly entered into between John T. Sullivan, Peter C. Burke, Frank Salisbury, and Henry M. Ryan, parties of the first part, and A. R. Holcomb, V. F. Clays, and W. I. Snyder, parties of the second part. This agreement, so far as material here, provided as follows:

"And whereas, certain litigations are pending between the American Eagle Mining Company et al., plaintiffs, against said Clays, Holcomb and Sullivan, defendants, and said Snyder has by proper instrument in writing agreed to maintain and pay the expenses of said litigation on the part of said defendants.

"Now, therefore, in consideration of the premises and of the circumstances, and also of the matters herein recited, the said parties do hereby covenant and agree to form a corporation under the laws of the Territory of Utah, with a capital of $500,000. divided into one hundred thousand shares of the par value of $5 each, for the purpose of owning, acquiring and working the mining claims aforesaid, including the other five twenty-fourths of said Champlain No. 2, if the same shall be acquired, and to divide said stock as follows: 70 per cent thereof to said parties of the first part, to be divided among them in such manner as they shall agree, and 30 per cent thereof to said parties of the second part, to be divided among them in such manner as they shall agree upon.

"The said Snyder is to pay the expenses of said litigation to final judgment, that is to say, the retainer to W. H. Dickson of $2,000 and to Expert Brunton, of Colorado, not exceeding $1,000. Also the expense of witnesses, court reporters, experts, and other necessary expenses and costs upon the trial of said cause.

"It is further mutually agreed that the present interests of said parties of the first part are of a value of $34,000, and that the interests of the said parties of the second part for the purposes mentioned in this paragraph, shall be the actual sum paid out by Snyder for and on account of said litigation, as aforesaid, and that

said two sums shall be paid back to said parties pro rata out of the proceeds of ore sales, compromises or otherwise, together with the payment of the matters recited in the previous paragraph, but the sum of $5,000 shall be paid to Salisbury, or his assigns, first of all. All of which are to be paid out and made good before any general dividend shall be paid out, or any other money except for necessary operations."

In accordance with the terms of the foregoing agreement, a corporation known as the Ajax Mining Company was organized, and after the litigation mentioned in the agreement was concluded it entered upon the development of the mining properties mentioned. Other mining properties, including the remaining five twenty-fourths of the Champlain No. 2, were subsequently acquired by the corporation at a cost of $46,000, which amount was paid by installments to the parties, or their assignees, from whom the purchases were made. At a meeting of the board of trustees of the company held October 23, 1894, a motion was made and carried "that a mortgage be given to secure the payment of the amounts due Burke and Salisbury, and also the attorney fees, also money due Snyder, as per contract" (referring to the contract of June 7, 1894, portions which are hereinbefore set out). At a meeting of the board of trustees held July 20, 1895, the following motion was made and carried unanimously: "It was moved and seconded that the action of the board of directors of this company as reported by the president in adopting the contract of June 7, 1894, made between Salisbury, Burke, Ryan, Snyder, Clays and Holcomb, also in recognizing and agreeing to pay same, as also the amount due Ryan and Knox and McIntyre, and authorizing the trust deed and other suitable obligations and contracts to be issued therefor, be ratified, and in all repects adopted which motion, being put, was carried."

At a meeting of the board of trustees held February 9, 1895, as shown by the records of the company, "it was resolved and carried that the secretary be and he

is hereby instructed to prepare an evidence of indebt-
edness in the form of a trust deed showing the indebted-
ness due to Salisbury, Burke, Snyder, Ryan, Knox and
McIntyre, and providing for the payment of the same,
and report at next meeting, or an adjourned meeting to
be held February 16, 1895, at 7:30 p. m. Said indebted-
ness consisting of the following items: $5,500 advanced
by Snyder on purchase money; $5,000 due Salisbury or
assigns, to be a first lien: $29,000 due Burke and Salis-
bury or assigns, as per contract of June 9, and $19,634
due Snyder for expenses of suit, as per same contract,
and $6,030 due Ryan and Knox; $4,000 due McIntyre
and $10,000 to McIntyre for water.'' On January 1,
1895, Samuel McIntyre, plaintiff herein, became a stock-
holder and officer of defendant company. On Septem-
ber 6, 1895, Henry M. Ryan, and Marian Ryan, his wife,
by an instrument in writing, assigned to Frank Knox,
president of the company, and Samuel McIntyre, di-
rector, a block of stock of defendant corporation. The
writing so far as material in this case, provides, as fol-
lows: ''Know all men by these presents, that we,
Henry M. Ryan and Marian Ryan, of Chicago, Illinois,
for and in consideration of the sum of $18,679.56 to us
in hand paid by Frank Knox and Samuel McIntyre of
Salt Lake City, Utah, do hereby sell, assign, transfer, set
over and deliver unto said Frank Knox and Samuel Mc-
Intyre, 49,812 shares of the capital stock of the Ajax
Mining Company, a corporation of Utah Territory,
standing in our names and upon the books of said com-
pany, as follows, to-wit: 5,000 shares of said stock
standing in the name of Marian Ryan and 44,812 shares
thereof standing in the name of said Henry M. Ryan.
. . . . And the said Henry M. Ryan in consideration
of the purchase of said stock by said Knox and Mc-
Intyre hereby assigns, transfers and sets over unto the
said Knox and McIntyre all claims of said Ryan against
the said Ajax Mining Company, aggregating $9,015.00,
and all securities held by said Ryan to secure the pay-
ment of said sum.'' McIntyre received and paid for

two-thirds of the stock and account mentioned in the assignment and Knox received and paid for one third. The $9,015, mentioned in the assignment was a part of the $34,000 purchase price of the Champlain No. 2 and the Fraction mining claims. Three thousand and five dollars of the amount was credited to Knox on the books of the company, and McIntyre was given credit for $6,010 of the account, and the respective amounts charged against Ryan's account. The amount for which Knox received credit ($3,005) was subsequently paid by the company without objection, but it failed and neglected to pay McIntyre the $6,010 due him. On January 15, 1897, McIntyre commenced an action against the company to recover the $6,010. The defendant answered, and the trial was had and when the plaintiff rested his case a judgment of nonsuit was entered, and the case dismissed. An appeal was taken to this court, and the judgment of the trial court affirmed, without prejudice to the bringing of an other suit by plaintiff. McIntyre v. Ajax Min. Co., 20 Utah 323, 337, 338, 60 Pac. 552. For a more detailed statement of the facts reference is hereby made to the opinion of this court rendered on that appeal.

On January 24, 1901, McIntyre commenced the present action alleging substantially the same facts as were set out in the complaint in the former suit, namely, that on or about the first day of February, 1895, at Salt Lake City, Utah, one Frank Salisbury sold and conveyed to defendant an undivided one-half interest in the mining claims hereinbefore mentioned for the sum of $17,000; that thereafter, on or about May 1, 1895, for a valuable consideration, the said Salisbury sold and transferred his said claim to Henry M. Ryan, and that on the sixth day of May, 1895, the said Henry M. Ryan, for a valuable consideration, sold, assigned, and transferred to the plaintiff $6,010 of said claim of $17,000; that defendant was immediately informed of said assignment and transfer, and accepted the same, and then and there promised and agreed to

pay the said amount to the said plaintiff. The defendant denied the allegations of the complaint relied upon for a recovery, and alleged that Burke and Salisbury claimed and represented to W. I. Snyder and H. M. Ryan, two of the promoters of this mining enterprise, before the agreement hereinbefore referred to was entered into, that they had a perfect and absolute title to the mining property mentioned therein, subject only to the paramount title of the United States; and that said mining claims contained large quantities of valuable and paying ore. Defendant further alleged that said representations were untrue in this: that there was no ore in said property, nor was the title to said property clear, perfect and absolute, but, on the contrary, a large portion of said mining claims was then and there the property of others. Defendant further alleged that at the time plaintiff procured the assignment from Henry M. Ryan of the $6,010 sued for, said plaintiff was a director and vice-president of defendant company, and acting in a confidential and fiduciary capacity with respect to defendant and its stockholders, and that he paid nothing whatever for said claim, and that under such circumstances it became and was the duty of plaintiff to obtain said assignment for this defendant and its stockholders, and not for his personal profit and gain. The issues were tried by a jury, who returned a verdict for plaintiff, and from the judgment entered thereon this appeal is taken.

McCARTY, J., after making the foregoing statement, delivered the opinion of the court.

The first contention made on this appeal is that the trial court erred in overruling defendant's motion for a nonsuit. Appellant insists that, as the contract of June 7, 1894, between Burke and Salisbury and Snyder and others, provided the $34,000 was to be paid out of the proceeds of ore sales, compromises, or otherwise, it was incumbent upon respondent to prove by a preponderance of the evidence that the profits of

the mines were sufficient to pay plaintiff's claim after liquidating other claims which took precedence of, and were, under the terms of the contract, superior in point of time to, the claim sued on. This same question was raised and squarely presented to this court in the case of McIntyre v. Ajax Min. Co., supra, and Mr. Justice BASKIN, now Chief Justice, speaking for the court said: "To understand the full bearing of the testimony, it is necessary to construe the terms 'that said two sums shall be paid pro rata out of the proceeds of ore sales, compromises, or otherwise,' as used in the contract of June 7, 1894. Following these terms it is provided that no other money shall be paid out, except for necessary operations, until after the payment of the sums mentioned in said contract. From this provision it is clear that the term 'proceeds of ore sales' was intended to include only the proceeds left after paying the expenses of necessary operations, or, in other words, the net proceeds. It is clear that the parties did not intend that payment was to be immediately made, or should depend exclusively on the proceeds of ore sales and compromises, or that said claims should become due and payable only when sufficient funds to pay said claims should be received from the proceeds of ore sales or compromises, because, if such had been the intention, the term 'or otherwise' would not have been used. The proper construction of these terms is that, if the net proceeds of ore sales and that derived from compromises did not, within a reasonable time, amount to a sum sufficient to liquidate said claims, then payment was to be made otherwise; which means that after a lapse of a reasonable time the obligation to pay was to become absolute, and not dependent upon either the proceeds of ore sales or compromises. (Bearing upon this question, see cases cited in Johnston v. Schenck, 15 Utah 490 [50 Pac. 921].)" This same general doctrine was reaffirmed by this court in the case of Busby v. Century Gold Min. Co., 27 Utah 231, 75 Pac. 725. Therefore, under the law as declared in

those cases, which we again reaffirm, the court did not err in denying defendant's motion for a nonsuit.

The claim made by appellant that McIntyre paid nothing for the account is not supported by the record. The written assignment by which it was transferred to him reads as follows: "And the said Henry M. Ryan in consideration of the purchase of said stock by said Knox and McIntyre, hereby assigns and transfers and sets over unto the said Knox and McIntyre, all the claims of said Ryan against said Ajax Mining Company, aggregating $9,015, and all securities held by said Ryan to secure the payment of the same." It will thus be observed that the account in question was a part of the consideration received by Knox and McIntyre for the $18,697.56 paid by them in the transaction whereby they purchased from Ryan 49,812 shares of the capital stock of defendant company, which transaction is fully set forth in the foregoing statement of facts.

Nor was the purchase of this claim by McIntyre a fraud against the company. The company had repeatedly, through its board of trustees, by resolutions which were made matters of record, acknowledged the account as a valid and binding obligation on its part, even to the extent of authorizing the execution of trust deeds and mortgages on the company's property to secure the payment of this and other items of its indebtedness. At the time McIntyre purchased the account the corporation was solvent, and he was in no way charged with a duty by the company to pay off and discharge the claim for its benefit. Nor were the rights of creditors prejudiced, or in any way involved, in the transaction. Therefore, under these circumstances, we fail to comprehend upon what theory the purchase of a valid claim against a corporation by one of its directors should be deemed fraudulent. As stated by counsel for respondent in their brief, this is not a case "where the corporation is insolvent, and the question arises between the director and other creditors of the corporation. In such a case it is very prop-

erly held that the property of a corporation constitutes a trust fund; that the director is to be regarded as a trustee; and that he may not, by purchasing outstanding claims against the company at a discount, and putting them in for their face value, thus reap an advantage, because of his position over the general creditors of the insolvent company; nor where the director or other officer of the company is charged with a present duty to pay off or discharge a claim for the benefit of the company, he may not acquire it in his own name at a discount, and compel the company to pay him the full face value.'' In fact, it is settled by the great weight of authority that a party may contract with a corporation of which he is a director, provided he acts in good faith. In 10 Cyc. 807, the rule is stated as follows: ''There is no sound principle of law or equity which prohibits one or more of the directors of a corporation from entering into contracts and dealings with the corporation, provided they act in good faith, and provided there is a quorum of directors on the other side of the contract, so that the vote of the interested director is not necessary to the adoption of the measure; and even in the latter case the contract is good in law.'' (See cases cited in note.) This being the law, it necessarily follows that a party may rightfully purchase a bona fide existing claim against a corporation of which he is a director, provided that, as in this case, the rights of other creditors are not involved, and he is under no present duty to act in the transaction for the corporation. Seymour v. Cemetery Ass'n, 144 N. Y. 333, 39 N. E. 640, 26 L. R. A. 859; Carpenter v. Danforth, 52 Barb. 581; St. Louis, etc., Ry. Co. v. Chenault (Kan.), 12 Pac. 303; 1 Morawetz, Corp. (2 Ed.), section 521.

The contention of appellant that Burke and Salisbury represented to the promoters of the corporation that they had an absolute and clear title to the mining property mentioned in the contract of June 7, 1894, and for which the company agreed to pay $34,000, and that defendant relying upon such representations, was in-

duced to purchase the property, and that it subsequently transpired that Burke and Salisbury had no title thereto, is not supported by the evidence. The contract by which defendant purchased and came into possession of these mining claims recited that certain litigation was pending, and contained provisions for the payment of the expenses of such litigation, and then, referring to the $34,000 purchase price of said mines and the expenses of the litigation, further recited as follows: "And that said two sums shall be paid back to said parties pro rata out of the proceeds of ore sales, compromises, or otherwise." It is evident that the term "compromises" had reference only to the then pending litigation, as such litigation was the only matter covered by the contract that was at that time susceptible of a compromise. In fact, counsel for appellant, in their brief, say: "That in 1894 P. C. Burke and Frank Salisbury claimed to be the owners of nineteen twenty-fourths of the Champlain No. 2 mining claim and all of the Fraction claim; that there was litigation pending between them and the American Eagle Mining Company, a corporation, claiming to own said claim, and also adjoining properties. Burke and Salisbury were unable to carry on the litigation, or to develop the property claimed by them. Accordingly they entered into a contract with W. I. Snyder and others by the terms of which the latter were to pay the expenses of the litigation. . . . The litigation was concluded, and the company entered upon the work of developing its properties." The record further shows that at the time the contract was entered into, appellant was in possession of an abstract of the title to the property, which showed that the title was clear and unclouded. Therefore the contention of counsel, in the face of the record and their own statement of the case that the promoters of this enterprise were ignorant of the adverse claims that were being made to the property and as to the character of title held by Burke and Salisbury, is unwarranted, and not supported by the record.

We find no reversible error in the record. The judgment is therefore affirmed, with costs.

BASKIN, C. J., and BARTCH, J., concur.