Louis M. Hauben and Others, Individually and as Stockholders of Industrial Finance Corporation, Suing on Behalf of Themselves and All Other Stockholders of Industrial Finance Corporation Similarly Situated, and in the Right of Industrial Finance Corporation, Respondents, *v.* Arthur J. Morris, Carll Tucker, Henry H. Kohn, R. Randolph Hicks, Frank K. Houston and Industrial Finance Corporation, Appellants, Impleaded with Fergus Reid and Others, Defendants.*

First Department, June 30, 1938.

* See 161 Misc. 174.

*Joseph M. Proskauer* of counsel [*Eugene Eisenmann* and *Lloyd F. Thanhouser* with him on the brief; *Satterlee & Canfield*, attorneys], for the appellants Morris, Tucker, Kohn, Hicks and Houston.

*Lloyd F. Thanhouser* of counsel [*James L. Robertson* with him on the brief; *Satterlee & Canfield*, attorneys], for the appellant Industrial Finance Corporation.

*Harris Berlack* of counsel [*Harold W. Hastings, Benjamin H. Siff* and *Charles S. Corben* with him on the brief; *Frank Aranow* and *Harry A. Gair*, attorneys], for the respondents.

*Frank Aranow* of counsel [*Harold W. Hastings* and *Sydney A. Hellenbrand* with him on the brief; *Harry A. Gair* and *Frank Aranow*, attorneys], for the plaintiffs Louis M. Hauben and William I. Rosenfeld.

*Harry Friedman*, for the plaintiff George L. Rusby.

*Norman Winer* of counsel [*Bondy & Schloss*, attorneys], for the plaintiff Norman P. S. Schloss.

UNTERMYER, J. The defendant Industrial Finance Corporation, to which we will refer as IFC, is a Virginia corporation. It was incorporated on February 16, 1914, and shortly thereafter qualified to do business in the State of New York. Its principal purposes were to organize, supervise and finance " Morris Plan " banks

which engage in the business of lending, for one year or less, amounts ranging from $25 to $5,000, repayable in installments. Approximately, one hundred Morris Plan banks were thus organized throughout the United States, with IFC holding a percentage of stock in each bank. Upon completion of this nation-wide organization, IFC's capital was almost entirely invested in stocks of these banks and in stocks of certain subsidiary corporations. In 1919 IFC entered upon the business of financing the purchase and sale of Studebaker automobiles, which quickly expanded to proportions of $30,000,000 to $40,000,000 a year. In 1922 IFC obtained additional capital by the sale to John Markle, a Pennsylvania investor, of $2,000,000 principal amount of six per cent collateral trust gold bonds, at a price of 95, out of a total authorized issue of $2,500,000, secured under a collateral trust agreement by approximately $3,500,000 par value of IFC's shares of stock in various Morris Plan banks. The business of IFC continued its rapid expansion in the years 1922 to 1924 with the result that there was at times a pressing need for additional capital.

The events surrounding the transactions involved in this derivative stockholders' suit occurred in the years 1924 to 1928. The suit was commenced in the latter part of 1934, a few days after the plaintiff Hauben had become a stockholder of record of sixteen shares of one dollar par value stock (at a cost to him of twenty-seven dollars) out of a total of $4,591,000 par value of stock outstanding. The other parties plaintiff were added in 1935 and in 1936. The action was brought against directors of IFC, five of whom were served, to recover the profits realized by them and by others on the purchase of stock of the corporation which it is charged should have been acquired for the corporation.

Prior to February, 1925, Markle was president of IFC and prior to December, 1926, he was its largest stockholder. Previous to February, 1925, Morris was vice-president and general counsel of IFC, and as such had active supervision and management of its affairs. He was the originator and founder of the Morris Plan of industrial banking, which bore his name and which, largely through his efforts, had been developed on a nation-wide scale by IFC. In 1925 and 1926 Morris was the second largest stockholder.

In October, 1922, IFC and the Studebaker Corporation had entered into a new contract covering IFC's wholesale and retail financing of Studebaker automobiles, which contract provided, among other things, that either party thereto might cancel at will upon sixty days' notice. In May, 1924, the Studebaker Corporation had threatened to cancel its contract with IFC unless the latter procured additional capital.

On October 22, 1924, Markel made a written offer to IFC to exchange his six per cent collateral trust gold bonds in the amount of $1,855,800 for shares of seven per cent debenture stock to be issued by IFC, upon terms and conditions which were duly accepted by the board of directors, and approved by the stockholders at a special meeting on December 18, 1924. The effect of this exchange was to release IFC's Morris Plan bank stocks, practically all of which were pledged to secure Markle's bonds, for current bank loans. The new debenture stock was a first preferred stock with a par value of $100 a share, redeemable at $105 per share at the option of the company at any time after three years. The charter amendment authorizing the issue provided that, in the event of default in the payment of two dividends, the debenture stock would be entitled to elect a majority of the board of directors, but other than this it had no voting power.

As part of the transaction, IFC contracted with Markle to purchase from him at par 2,500 shares of this debenture stock within twenty days after demand and, at the redemption price of $105, 1,000 shares annually commencing January, 1926, and the balance of the stock held by him by January, 1932. It was also agreed that IFC would not create any security, mortgage or bond issue superior to the debenture stock which should be a lien on the security which had been collateral for the gold bonds. It was agreed, however, that IFC might use that security for the purpose of obtaining short term bank loans made from time to time for current purposes in the usual course of business. In connection with the transaction Markle received from IFC a bonus of 2,000 shares of common stock. The debenture stock authorized by the charter amendment was $5,000,000 par value of which $1,805,000 was issued to Markle, the rest remaining unissued.

In January, 1925, IFC transferred its automobile financing business to a newly organized subsidiary, Industrial Acceptance Corporation, to which we will refer as IAC. IFC advanced $1,500,000 to IAC and received $1,500,000 of second preferred stock and 100,000 shares of common stock. A first preferred stock issue of $4,000,000 was sold to the public, underwritten by bankers who received, as compensation from IFC, 50,000 shares of common stock of the new corporation. Morris had originally received 50,000 shares of IAC common stock for his services and to insure his continuance in the business. Markle objected to Morris' divided financial interest and the matter was seemingly adjusted amicably by Morris surrendering his 50,000 shares of IAC stock to IFC in return for 30,000 shares of IFC common stock. Notwithstanding Markle's participation in this transaction, it appears to

have been the beginning of bitter personal animosity which gradually developed with Morris.

In February, 1925, Markle relinquished the presidency of IFC and became chairman of its board of directors. Morris then succeeded Markle as president. In July, 1925, Markle left for Europe on account of ill health, where he remained until late in April, 1926.

After consummation of the IAC transaction, IFC remained in need of further capital for the development and expansion of the Morris Plan part of its business. Raising money by short-term bank loans had resulted in an excess of current liabilities over current assets. The dividend policy of the various Morris Plan banks in which funds of IFC were invested was conservative, and about one-half of IFC's total earnings was derived from dividends on its holdings of IAC stock, a substantial portion of whose income depended on the Studebaker contract which was cancellable on sixty days' notice. It was obvious that a permanent and sounder form of financing was essential to relieve the corporation of its burdensome short-term loan position, and to enable it to acquire additional stock in banks in which it held a minority interest as well as to organize new banks. Accordingly, it was proposed to sell the unissued residue of the seven per cent debenture stock. In October, 1925, the board of directors authorized, and subsequently the stockholders approved, an increase of debenture stock for the purpose of enlarging the working capital of the corporation. Markle protested against such a plan, contending that his contract with IFC forbade the sale of additional debenture stock under the provision that no lien superior to his debenture stock should be created, which he construed to include the issue and sale of additional securities having an equal status.

Without doubt the proposal to sell additional debenture stock intensified the bitterness then existing between Markle, who at that time was seriously ill, and Morris. Markle's rancor had been inflamed when Morris previously declined to accede to a request to divide with him the 30,000 shares of common stock of IFC which Morris had received in exchange for the 50,000 shares of common stock of IAC when the latter corporation was organized. All this culminated in instructions by Markle to Robinson, his private secretary, to give notice to Morris that he expected him to " pay me off before going into any new propositions;" that he opposed the purchase of control of certain western Morris Plan banks; and that Morris " would never have had a Morris Plan  *  *  * except for John Markle." He further stated that " Morris could borrow the money to pay me off and as I stated to you, I would accept par for the 7% debenture preferred stock which I now hold."

Shortly thereafter Markle canceled his offer to sell his debentures at par, and stated that he would not sell for less than 105.

The Special Term has found, erroneously we think, that these offers were made to Industrial Finance Corporation. The evidence is entirely to the contrary. Indeed it may even be doubted whether Markle would have sold to the corporation if the corporation had been in a position to buy. Markle died before the trial of this action. Hartfield, his attorney, testified that he doubted whether Markle would have sold to the corporation since there would have been involved the question of corporate power to make the purchase. He recalled that the only question then considered was whether Morris could form a responsible group to acquire Markle's interest in the corporation.

The respondents contend that the offer to sell was made generally without any specification as to who the purchasers should be. The testimony establishes that Hartfield advised Morris at that time that if Markle's holdings were not acquired it would mean a long and acrimonious litigation, injurious to Morris, Markle and the corporation and that he considered that the constructive thing to be done was for Morris to organize a group to buy all Markle's stock. Indeed we think it is very clear that the only definite offer was that Markle would sell to a syndicate of responsible individuals who would agree to acquire all of his securities in IFC and its affiliated Morris Plan companies.

Markle had been widely known as the financial backer of IFC but now, because of divergent views as to corporate financial policy and probably also on account of personal animosity " he did not want to have anything to do with the company if Mr. Morris was going to have anything to do with it." Because of this hostile attitude, IFC's board of directors concluded that consultation and co-operation between the chairman of the board and the president were impossible and accordingly adopted a resolution abolishing the office of chairman. Markle was threatening to commence ruinous litigation and had in fact written two letters to the president of the Studebaker Corporation which put in jeopardy IFC's contract with that company. It was under these trying circumstances that steps were undertaken to form a syndicate for the purchase of Markle's holdings.

After lengthy negotiations, Markle fixed November 1, 1926, as the deadline for the formation of the syndicate. Morris pleaded with each member of the board to make subscriptions. Out of a total of twenty-four directors then in office, he was able to prevail on only eleven to join the syndicate and assume the consequent risk. Sufficient subscriptions were not obtained by November

first. However, Hartfield prevailed on Markle to continue the negotiations but it was declared that subscriptions satisfactory to Markle must be submitted to him by December first. By strenuous efforts this was accomplished, and on November 30, 1926, a list of twenty-two subscribers was transmitted to Hartfield. Actually thirty individuals participated in the subscription, of which ten were then directors. Another participant was Howe, Snow and Bertles, Inc., a corporation, in which a director of IFC (Bertles) was vice-president. Of the five defendants against whom judgment has been entered, four (Hicks, Kohn, Morris and Tucker) were then directors. Houston was not then connected with IFC but became a director on February 14, 1927.

To afford Markle an opportunity to investigate the financial responsibility of the subscribers, the closing date was postponed to December sixth. It was adjourned again to December 20, 1926, when it actually took place at the office of J. P. Morgan & Co. Upon execution of the syndicate agreement, all of Markle's stocks were placed in the hands of J. P. Morgan & Co., as Markle's agents for the execution of the agreement. Thereafter and pursuant to the agreement, the board of directors and the executive committee of IFC amended the minutes of the meeting of September 16, 1926, to rescind the action of the board abolishing the office of chairman of the board, and the resignation of Markle as a director and as chairman was duly accepted.

The syndicate agreement provided for the sale by Markle to the syndicate of 14,550 shares of IFC debenture stock (designated as Parcel A) at $95 per share, or a total of $1,382,250, to be paid, ten per cent upon the signing thereof, $460,750 on or before May 1, 1927, $460,750 on or before November 1, 1927, and the balance on or before May 1, 1928; and also for the sale of 4,811 shares of IFC seven per cent preferred stock, 18,500 shares of IFC common stock, 210 shares of Morris Plan Company of New York and 75 shares of Morris Plan Insurance Society (collectively designated as Parcel B) for a total of $542,750, payable ten per cent upon the signing of the agreement, $271,375 on December 1, 1927, and the balance on June 1, 1928. Thus the price of the entire lot was $1,925,000, the approximate cost of Markle's holdings.

It was provided that the stock was to be released by J. P. Morgan & Co. as payment for it was made. There was to be interest on the unpaid installments at the rate of six per cent. The subscription agreements, which were incorporated by reference in the syndicate agreement, provided that each subscriber was acting " severally and not jointly " and was not to be liable for more than his own

subscription. Dividends upon the securities thus sold by Markle were to be credited by J. P. Morgan & Co., his agents, toward the purchase price.

In contracting with Markle the subscribers to the syndicate agreement undertook a personal obligation and paid him with funds belonging to them individually or borrowed from banks on a pledge of their own credit. The first installment due to Markle on May 1, 1927, for $460,750 plus interest was anticipated in part and reduced to $269,991.94 by sums received (a) from syndicate participants who paid for and withdrew their shares; (b) from dividends credited to the syndicate; and (c) from the repurchase price of 1,000 shares of debenture stock on February 1, 1927, retired by IFC pursuant to its agreement with Markle. The balance of the May first installment was obtained by a loan of $270,000 made by the Chemical National Bank upon the personal note of Messrs. Morris and Brown, both substantial subscribers to the syndicate, secured by the debenture stock released by J. P. Morgan & Co., and the syndicate indemnified Morris and Brown against loss, pledging as security the obligations of the individual subscribers. The amount thus borrowed was first loaned to the syndicate managers, who paid the proceeds to Markle's agents and were credited on account of the purchase price, the security being simultaneously released to the bank upon receipt of the proceeds of the loan. The exact balance thus paid by the syndicate to Markle on May 1, 1927, was $269,991.94. The personal obligations of the syndicate subscribers were behind this loan.

During the spring and summer of 1927, further sums were paid by certain syndicate subscribers who took down their own stock. By means of the sale in August, 1927, of a portion of the Parcel B stocks, the syndicate raised $402,876.19 which amount was paid to J. P. Morgan & Co., and credited to the syndicate on account of the total purchase price. On August 18, 1927, the balance due Markle under the syndicate contract was paid in full. To make this final payment the syndicate managers, Tucker and Brown, borrowed on their own note $690,000 from the Guaranty Trust Company, giving as collateral 9,695 shares of debenture stock simultaneously released .by Markle's agents, together with an assignment of the syndicate agreement and the several obligations of the individual subscribers thereunder. Payments were thereafter made by the syndicate on account of both the Chemical and Guaranty loans, which bore interest at the rate of six per cent and which were renewed from time to time.

With Markle disposed of, IFC continued its efforts to obtain additional capital. In January, 1927, negotiations were begun

with W. A. Harriman & Company for the flotation of a long term bond issue to retire the outstanding debenture stock, pay off current bank loans, acquire additional stock of Morris Plan banks and generally simplify IFC's capital structure. When these negotiations failed, they were followed by proposals to other investment banking houses, and finally on August 25, 1927, a refinancing plan proposed by a banking group composed of Redmond & Co., Manufacturers Trust Company, and Bertles, Rawles & Donaldson, Inc. (of which latter corporation defendant Bertles was chairman of the board, a director of IFC and a member of the syndicate), was accepted. It provided for the formation of a wholly owned subsidiary known as Morris Plan Shares Corporation (referred to as MPSC) to which IFC was to transfer substantially all its stock holdings in Morris Plan banks, MPSC was to issue $4,500,000 six per cent convertible gold bonds, guaranteed by IFC, which the bankers were to purchase at $92.75 plus accrued interest. These bonds were to be convertible into IFC ordinary preferred stock and carry warrants entitling the holder to purchase four shares of IFC common stock at a specified price. A sinking fund of $100,000 per year was provided to be used to purchase and redeem the bonds. The retirement of the debenture stock was deemed essential to simplify the corporate structure and strengthen the credit of the corporation. After approval of the stockholders, a trust indenture was finally executed on October 4, 1927, and the $4,500,000 of bonds issued, The trust indenture provided, among other things, that IFC should apply the proceeds of the bonds " to the purposes for which they are issued," which included the redemption of the debenture stock. The New York Morris Plan Company had just been required by the Superintendent of Banks to double its capital, and $500,000 or more was invested in newly issued stock of that bank. After current bank loans had been paid and other required disbursements made, a cash balance of about $1,400,000 remained for the retirement of debenture stock.

IFC's certificate of incorporation, by the law of the State of Virginia, was deemed to require that preferred stock remain outstanding for at least three years from the date of original issue. Consequently, the $1,400,000 of surplus funds were retained in bank or on call at a very low rate of interest, resulting in a daily loss of interest. It was, therefore, considered advisable to use these funds to anticipate the redemption of the debenture stock and save IFC an expense of seven per cent per annum thereon. The proposal was carried out by a loan of $1,190,445 made on February 1, 1928, to the syndicate managers on their note, bearing interest at the rate

of seven per cent per annum, secured by 12,531 shares of debenture stock, upon the understanding that IFC would retain the dividends in lieu of interest for the period of the loan. The syndicate then owed a total of $854,738.94 upon its loans at the Chemical National Bank and Guaranty Trust Company, on which it was paying only six per cent interest, which loans were discharged with the proceeds of the loan from IFC. Thus, when the loan was fully repaid on May 1, 1928, IFC had benefited by the transaction. Dividends of seven per cent on the debenture stock were paid on a $100 par basis while the loan was made on the basis of only $95 per share. Consequently, the return to the corporation was higher than seven per cent. On the other hand, the syndicate suffered a loss of about $9,000, consisting of the difference between $12,821.06, which would have been paid to the banks for interest, and $21,929.25, which was paid to the corporation.

The process of redemption is criticized by the respondents who assert that the defendants failed to make a full disclosure of their interest therein. On February 27, 1928, Morris addressed a letter to the directors of the corporation, in which he reviewed the conditions which had led up to the formation of the syndicate, the fact that a substantial portion of the amount raised by the syndicate was subscribed by certain of the directors in the amount of $1,401,000 and the remainder of $524,000 by other parties, the fact that the corporation had the right to redeem under the terms of its charter the debenture stock on any interest date after the expiration of three years from the date of issue, the understanding with the bankers, when provision was made for financing future investments, that the debenture stock would be retired as soon as redemption was practicable, and in conclusion suggested that the board recommend to the stockholders the redemption of the outstanding debenture stock. Attached thereto was a list showing the syndicate participants who were directors in 1927, as well as the other parties.

On March 6, 1928, at a meeting of the board of directors the letter was read and resolutions were adopted providing for the redemption, retirement and cancellation of all the issued debenture stock. The minutes recite that of the nineteen directors present, eight who were syndicate members refrained from voting. A special meeting of stockholders was held on March 22, 1928, and with more than two-thirds in interest of each class of stock voting, resolutions were adopted providing for the redemption, retirement and cancellation of all debenture stock, both outstanding and in the treasury of the corporation. After this action became effective

upon the approval of the Virginia State Corporation Commission, the debenture stock was redeemed on May 1, 1928, at the redemption price of $105 per share.

It is conceded that most of the common stock voted at the stockholders' meeting was held by voting trustees and that four out of the five were syndicate members. The appellants contend, however, that, in their capacity as voting trustees, they were acting in the right of the stockholders whom they represented. However this may be, the court expressly found that the retirement of the debenture stock at the price of $105 was for the best interests of the corporation.

The profits realized by the syndicate members, thirty in number, have been held to consist of $145,000 at the rate of $10 per share on 14,550 shares, plus the dividends received between December 20, 1926, the date of the contract with Markle, and May 1, 1928, aggregating $133,277.50. To the extent of these profits and dividends, the Special Term has held that the defendant directors permitted the assets of the corporation to be wasted.

The respondents have charged five violations by the appellants of their fiduciary duty to the corporation of which they were directors. These are (1) that they purchased for a syndicate of which they were the principal members, shares of stock which it was their duty to acquire for the corporation; (2) that they purchased those shares for the purpose of reselling to the corporation at a profit; (3) that in connection with the transaction they caused the corporation to loan its funds in violation of section 59 of the Stock Corporation Law; (4) that acting both for themsleves and for the corporation they resold these shares to the corporation at a profit to themselves through a procedure wherein the corporation was not represented by independent and disinterested agents, and (5) that in causing the corporation to purchase the shares they failed to make adequate disclosure of the facts.

We think that the latter three of these contentions are not available to the respondents if the original acquisition of the debenture stock by the appellants did not constitute a breach of trust, for the reason that the respondents' remedy in that event would be limited to the rescission of the transaction claimed to be illegal. (*New York Trust Co.* v. *American Realty Co.*, 244 N. Y. 209.) Consequently, the utmost the corporation would have been entitled to assert, provided always that the appellants had lawfully acquired the debenture stock, was a right to rescind the loan and the transaction whereby the corporation had retired the debentures at 105. The judgment, however, does not accord that relief, and for obvious

reasons. The loan was repaid in full. It was of benefit to the corporation and to some extent detrimental to the appellant. The acquisition of the debenture stock by the corporation was likewise beneficial to the corporation, as the Special Term expressly found, nor does the corporation desire to rescind any part of that transaction.

The only question then is whether the acquisition by the appellants of the debenture stock from Markle was of such a character that they should be regarded as trustees for the corporation and required to account for the profit received on the resale. Ordinarily a director may deal in securities of his corporation without subjecting himself to any liability to account for profits, for the corporation as such has no interest in its outstanding stock or in dealings in its shares among its stockholders. (*Bisbee* v. *Midland Linseed Products Co.*, 19 F. [2d] 24; certiorari denied, 275 U. S. 564; *Du Pont* v. *Du Pont*, 256 Fed. 129; certiorari denied, 250 U. S. 642.) Likewise, a director may ordinarily buy at a discount the unmatured obligation of his corporation with the intention of collecting in full when the obligation matures. (*Seymour* v. *Spring Forest Cemetery Assn.*, 144 N. Y. 333; *Glenwood Mfg. Co.* v. *Syme*, 109 Wis. 355; 85 N. W. 432; *McIntyre* v. *Ajax Mining Co.*, 28 Utah, 162; 77 P. 613.) It follows from these principles that the appellants had the right to buy for themselves unless the circumstances imposed upon them a " mandate " to buy for the corporation. (*Burland* v. *Earle*, L. R. [1902] A. C. 83.) Such appears to be the settled rule of law. (*Bisbee* v. *Midland Linseed Products Co., supra; Du Pont* v. *Du Pont, supra; Lagarde* v. *Anniston Lime & Stone Co.*, 126 Ala. 496; 28 So. 199; *Pioneer Oil & Gas Co.* v. *Anderson*, 168 Miss. 334; 151 So. 161; *Colorado & Utah Coal Co.* v. *Harris*, 97 Colo. 309; 49 P. [2d] 429; *Tierney* v. *United Pocahontas Coal Co.*, 85 W. Va. 545; 102 S. E. 249.) We find nothing in the circumstances of the present case to require a deviation from that rule. The corporation had never negotiated with Markle for the purchase of his interest in its stock and under all the circumstances it is to be doubted whether Markle would have been willing to sell to the corporation in view of the extreme caution he had shown in investigating the responsibility of the purchasers. The corporation at this time was seeking capital; it was not seeking to reduce its capital by the purchase of its own stock. It is to be remembered also that Markle desired to sell his entire interest in the corporation, including not only his debenture stock but preferred and common stock and shares in two subsidiaries, for which the corporation clearly was not a logical purchaser. The transaction was concluded in order to preclude the

possibility of a course of action by Markle which would not only have been detrimental to the company but to Morris in particular. We may wonder whether, under those circumstances, the defendants would have been justified in spending the funds of the company " in keeping themselves in power, or in purchasing the retirement of inquisitive and troublesome critics." (*Trevor* v. *Whitworth*, L. R. 12 A. C. 409, 435.)

Moreover, the corporation did not have sufficient surplus with which to make such a purchase of its own stock, or at the very least, such a transaction would have been highly improvident. It had no liquid assets sufficient for that purpose, but it is argued that it had other assets, consisting of good will and the shares of stock of Morris Plan banks, the value of which had been appreciated on the books of the company to an extent which, it is claimed, would have justified the transaction. Even assuming, notwithstanding expressions to the contrary (*Hill* v. *International Products Co.*, 129 Misc. 25; affd., 226 App. Div. 730; *Jennery* v. *Olmstead*, 36 Hun, 536; affd., 105 N. Y. 654), that unrealized appreciation of corporate assets based upon a proper estimate of enhanced value would have justified a purchase by the corporation of its own stock, it would have been a most improvident transaction under all the circumstances, resulting in an impairment of capital should any substantial depreciation in the value of those assets have occurred. Thus, upon the entire case, we find no dereliction of duty on the part of the appellants in acquiring the debenture stock.

The judgment, so far as appealed from, and the order should be reversed, with costs, and the complaint dismissed, with costs.

MARTIN, P. J., O'MALLEY, TOWNLEY and GLENNON, JJ., concur.

Judgment, so far as appealed from, and the order unanimously reversed, with costs, and the complaint dismissed, with costs. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.